Jerry R. LAWSON, Petitioner,

v.

WARDEN, MANSFIELD CORRECTIONAL INSTITUTION, Respondent.

Case No. C–3–96–163.

United States District Court, S.D. Ohio, Western Division.

March 29, 2002.

Roger Warner, Wallace & Warner, Columbus, OH, Mark Alexander Tuss, Vincent Paul Popp, Popp & Tuss–3, Dayton, OH, for Petitioner.

Charles L. Wille, Heather L. Gosselin, Assistant Attorney General's, Columbus, OH, for Respondent.

DECISION AND ENTRY OVERRULING PETITIONER'S OBJECTIONS (DOC. # 240) TO REPORT AND RECOMMENDATIONS OF MAGISTRATE JUDGE (DOC. # 233); DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART PETITIONER'S SUPPLEMENTAL OBJECTIONS (DOC. # 244) TO REPORT AND RECOMMENDATIONS OF MAGISTRATE JUDGE (DOC. # 233); DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART PETITIONER'S OBJECTIONS (DOC. # 252) TO SUPPLEMENTAL REPORT AND RECOMMENDATIONS OF MAGISTRATE JUDGE (DOC. # 250); REPORT AND RECOMMENDATIONS OF MAGISTRATE JUDGE (DOC. # 233) ADOPTED IN PART AND REJECTED IN PART; SUPPLEMENTAL REPORT AND RECOMMENDATIONS OF MAGISTRATE JUDGE (DOC. # 250) ADOPTED IN PART AND REJECTED IN PART; WRIT OF HABEAS CORPUS, VACATING PETITIONER'S SENTENCE OF DEATH, GRANTED; DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART PETITIONER'S APPLICATION FOR CERTIFICATE OF APPEALABILITY (DOC. # 246); DECISION AND ENTRY OVERRULING PETITIONER'S SUPPLEMENTAL APPLICATION FOR CERTIFICATE OF APPEALABILITY (DOC. # 253); DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART PETITIONER'S OBJECTIONS (DOC. # 260) TO REPORT AND RECOMMENDATIONS OF MAGISTRATE JUDGE CONCERNING CERTIFICATE OF APPEALABILITY (DOC. # 251); SAID JUDI-

CIAL FILING ADOPTED IN PART AND REJECTED IN PART; LEAVE TO APPEAL IN FORMA PAUPERIS GRANTED; JUDGMENT TO BE ENTERED IN FAVOR OF PETITIONER AND AGAINST RESPONDENT ON SIXTEENTH CLAIM AND IN FAVOR OF RESPONDENT AND AGAINST PETITIONER ON THE OTHER FORTY–SEVEN CLAIMS; TERMINATION ENTRY

RICE, Chief Judge.

On September 23, 1987, Petitioner Jerry R. Lawson ("Lawson" or "Petitioner") shot and killed Timothy Martin ("Martin"). On that date, Petitioner, along with his brother, Tim Lawson, and Billy Packer, drove Martin to a secluded part of Highland County, Ohio. When Martin got out of the Petitioner's car, Petitioner shot him. Lawson was charged with aggravated murder, in violation of Ohio Revised Code § 2903.01, and other offenses. He was also charged with death penalty specifications under Ohio Revised Code § 2929.04(A)(7) for murder during a kidnaping, under § 2929.04(A)(3) for murder for the purpose of escaping accountability for another offense, and under § 2929.04(A)(8) for murder of a witness.

In accordance with the law in Ohio, the Petitioner's trial was bifurcated into guilt and penalty phases, with the same jury sitting and Judge Robert Ringland of the Clermont County Common Pleas Court presiding at both phases. Tim Lawson testified against his brother during the trial, while Billy Packer did not testify. During the guilt phase, the Petitioner stipulated that he had fired a gun which had caused the death of Martin (Trial Transcript at 185) and raised an insanity defense, claiming that he suffered from brief reactive psychosis, a form of temporary insanity. The jury did not accept Lawson's insanity defense and found him guilty

of aggravated murder and the death penalty specifications. As a consequence, the penalty phase commenced, after which the jury returned a recommendation that the death penalty be imposed, finding that the state had proved beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors. Thereafter, the trial court conducted its own independent review of the evidence and found that the state had proved beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors. Accordingly, the trial court sentenced Lawson to death.

In accordance with Ohio law as it then stood, Petitioner appealed to the Clermont County Court of Appeals. That appellate court rejected Lawson's assignments of error and, after conducting its own independent review of the evidence, concluded that the state had proved beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors. *State v. Lawson*, 1990 WL 73845 (Ohio App. June 4, 1990). Thus, the court of appeals affirmed Lawson's conviction and the death penalty imposed upon him. The Petitioner appealed that decision to the Ohio Supreme Court, which affirmed the Clermont County Court of Appeals. *State v. Lawson*, 64 Ohio St.3d 336, 595 N.E.2d 902 (1992), *cert. denied*, 507 U.S. 1007, 113 S.Ct. 1653, 123 L.Ed.2d 273 (1993). The Ohio Supreme Court also independently weighed the aggravating circumstances and mitigating factors, concluding that the state had met its burden of proof in that regard.

Having exhausted his direct appeals, Lawson initiated an action in the Clermont County Court of Common Pleas, requesting post-conviction relief pursuant to Ohio Revised Code § 2953.21. That request was denied, without an evidentiary hearing, and Petitioner appealed to the Clermont

County Court of Appeals, which affirmed. *See State v. Lawson*, 103 Ohio App.3d 307, 659 N.E.2d 362 (1995). The Ohio Supreme Court denied Petitioner's request for further appeal. *State v. Lawson*, 74 Ohio St.3d 1404, 655 N.E.2d 184 (1995).

After having exhausted his available state remedies, Petitioner initiated this action, requesting a writ of habeas corpus, alleging that his conviction and sentence violated a number of provisions of the United States Constitution. In his Petition (Doc. # 9) and Amended Petition (Doc. # 29), the Petitioner set forth 48 separate grounds or claims for relief. This Court referred the matter to Magistrate Judge Michael Merz for a Report and Recommendations. On March 27, 2001, after having conducted a lengthy evidentiary hearing, Judge Merz issued his Report and Recommendations. *See* Doc. # 233. In particular, that judicial officer recommended that the Court deny the Petitioner's request for a writ of habeas corpus, with respect to all 48 asserted claims. The Petitioner filed Objections to that judicial filing. *See* Doc. # 240. Thereafter, he was permitted to augment his Objections by filing Supplemental Objections. *See* Doc. # 244. In response to the Petitioner's multiple filings setting forth Objections, Judge Merz, on December 18, 2001, filed a Supplemental Report and Recommendations, in which he recommended that the Court overrule the Petitioners Objections and Supplemental Objections. *See* Doc. # 250. The Petitioner, in turn, filed Objections to the Supplemental Report and Recommendations of the Magistrate Judge. *See* Doc. # 252. The Respondent has filed a consolidated memorandum opposing the Petitioner's Objections and Supplemental Objections to the Report and Recommendations, as well as a separate memorandum in response to Petitioner's Objections to the Supplemental Report and Recommendations. *See* Docs. # 245 and # 255.

In addition to objecting to the Reports and Recommendations of the Magistrate Judge, the Petitioner has requested a Certificate of Appealability ("COA"). *See* Doc. # 246. The Petitioner seeks a COA on all claims, except his First, Fifth, Eighth, Eleventh, Fourteenth, Seventeenth, Eighteenth, Nineteenth, Twenty–First, Twenty–Second, Twenty–Eighth, Thirty–First through Thirty–Fourth, Thirty–Sixth through Thirty–Ninth and Forty–First through Forty–Seventh Claims. *Id.* The Respondent has filed a memorandum in opposition to the Petitioner's motion. *See* Doc. # 249. On December 28, 2001, the Magistrate Judge issued a Report and Recommendations, suggesting that the Court grant a COA on only Petitioner's Second and Third Claims. *See* Doc. # 251. The Petitioner has filed Objections to that Report and Recommendations (*see* Doc. # 260), and a Supplemental Application for Certificate of Appealability (Doc. # 253). The Respondent has opposed each of those requests. *See* Docs. # 256 and # 261.

Herein, the Court rules upon Petitioner's Objections and Supplemental Objections to the Initial Report and Recommendations of the Magistrate Judge, as well as his Objections to that judicial officer's Supplemental Report and Recommendations. In addition, the Court decides whether Petitioner is entitled to a COA on any claims upon which he is not entitled to relief and, thus, rules upon his requests for same and his Objections to the Report and Recommendations of the Magistrate Judge on the question of a COA.

The Court begins by setting forth the standard of review it must apply when it reviews Reports and Recommendations of a Magistrate Judge in a habeas corpus proceeding. The Sixth Circuit has indicated that a District Court must apply a *de novo* standard of review to such a judicial filing. *Flournoy v. Marshall*, 842 F.2d 875

(6th Cir.1988). Accordingly, this Court reviews both Judge Merz' factual findings and his legal conclusions *de novo.* In addition, the Court notes that the relevant portions of Ohio's death penalty statutes are unchanged from the time of Petitioner's trial, except that there is no longer a right of appeal to the intermediate court of appeals.

■ Initially, this Court must decide whether the version of 28 U.S.C. § 2254(d), added by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 110 Stat. 1214, is applicable herein. In *Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), the Supreme Court held that the amended version of § 2254(d) did not apply to a request for habeas corpus which was already pending on the day that the AEDPA became effective, April 24, 1996. Herein, the Petitioner filed a Motion to Proceed In Forma Pauperis (Doc. # 1), a Motion for Appointment of Counsel (Doc. # 2) and a Notice of Intent to File Petition for Writ of Habeas Corpus (Doc. # 3), all on April 18, 1996. He did not file his Petition for Writ of Habeas Corpus (Docs.# 9), until May 10, 1996, after the AEDPA had become effective. Thereafter, he filed an Amended Petition. *See* Doc. # 29. Thus, the question becomes whether a request for a writ of habeas corpus is already pending on the day the AEDPA became effective, if, before that date, the petitioner had filed some preliminary papers but not his petition seeking the writ. In *Williams v. Coyle,* 167 F.3d 1036, 1037, 1040 (6th Cir.1999), the Sixth Circuit answered that question in the negative, holding that "a federal habeas corpus case is filed or pending for the purposes of *Lindh* and the AEDPA only when the petition for the writ is filed." *Id.* at 1040. Other circuits have reached the same conclusion. *Moore v. Gibson,* 195 F.3d 1152, 1162 (10th Cir.1999), *cert. denied,* 530 U.S. 1208, 120 S.Ct. 2206, 147 L.Ed.2d 239 (2000); *Gosier v. Welborn,* 175 F.3d 504, 506 (7th Cir.), *cert. denied,* 528 U.S. 1006, 120 S.Ct. 502, 145 L.Ed.2d 387 (1999); *Nobles v. Johnson,* 127 F.3d 409, 414 (5th Cir.1997), *cert. denied,* 523 U.S. 1139, 118 S.Ct. 1845, 140 L.Ed.2d 1094 (1998). Based upon *Williams* and the other cited authority, this Court concludes that the petition was not pending when the AEDPA became effective and that, therefore, it must apply the amended version of § 2254(d).

That statute provides:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; *or*

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court clarified the meaning of the post-AEDPA version of § 2254(d). In particular, the Court noted that § 2254(d)(1) contains two clauses, to wit: the "contrary to" and "unreasonable application" clauses, which have independent meanings. *Id.* at 404, 120 S.Ct. 1495. With respect to the "contrary to" clause, the Court noted that "[a] state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases," and that "[a] state-court decision will also be contrary to this Court's clearly established

precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Id.* at 405–06, 120 S.Ct. 1495. The Supreme Court held that the "unreasonable application" clause will be violated, if a state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407–08, 120 S.Ct. 1495. The Supreme Court also indicated that the inquiry is an objective one and, thus, rejected the argument that the subjective, "reasonable jurist" standard should be applied. *Id.* at 409–10, 120 S.Ct. 1495. Although the Supreme Court did not define "objectively unreasonable," it did indicate that an unreasonable application of federal law is different from an incorrect application of same. *Id.* at 410, 120 S.Ct. 1495. Thus, a writ of habeas corpus will not issue merely because the state court applied federal law incorrectly or erroneously. *Id.* at 411, 120 S.Ct. 1495. Finally, in determining whether a state court decision was contrary to or an unreasonable application of clearly established federal law, this Court may look only to "holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412, 120 S.Ct. 1495. *See also, Bulls v. Jones,* 274 F.3d 329, 333 (6th Cir.2001).

As is indicated above, the Court also rules herein upon the question of whether the Petitioner is entitled to a COA. The requirement for such a certificate is found in 28 U.S.C. § 2253(c), which provides:

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

In *Slack v. McDaniel,* 529 U.S. 473, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000), the Supreme Court explained that an applicant for a COA could make "a substantial showing of the denial of a constitutional right," as required by § 2253(c)(2), in accordance with the standard adopted in *Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983). 529 U.S. at 483–84, 120 S.Ct. 1595. The *Slack* Court explained that when the District Court has rejected a petitioner's constitutional claim on the merits, he must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* at 484, 120 S.Ct. 1595. With respect to instances in which the District Court denies relief on procedural grounds, the *Slack* Court held:

When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Id.*

As is indicated above, the Magistrate Judge recommended that this Court deny each of the Petitioner's 48 claims. The Petitioner has objected to the Magistrate Judge's recommendations concerning 27 of

his claims. He has not objected to Judge Merz' recommended denial of the First, Fifth, Eighth, Eleventh, Fourteenth, Seventeenth through Nineteenth, Twenty–First, Twenty–Second, Twenty–Eighth, Thirty–First through Thirty–Fourth, Thirty–Ninth, Forty–Second, Forty–Third and Forty–Fifth through Forty–Seventh Claims. Based upon its own, independent review of the record, this Court concurs with Judge Merz's recommendation that the Petitioner be denied relief on those 21 claims. Accordingly, the Court adopts the Report and Recommendations (Doc. # 233), as that judicial filing relates to the Petitioner's First, Fifth, Eighth, Eleventh, Fourteenth, Seventeenth through Nineteenth, Twenty–First, Twenty–Second, Twenty–Eighth, Thirty–First through Thirty–Fourth, Thirty–Ninth, Forty–Second, Forty–Third and Forty–Fifth through Forty–Seventh Claims. In addition, since the Petitioner has not requested a COA on any of those claims, the Court will not award such a certificate for any one or more or all of those 21 claims.

The Petitioner has objected to the Initial and Supplemental Reports and Recommendations with regard to the Second through Fourth, Sixth, Seventh, Ninth, Tenth, Twelfth, Thirteenth, Fifteenth, Sixteenth, Twentieth, Twenty–Third through Twenty–Seventh, Twenty–Ninth, Thirtieth, Thirty–Fifth through Thirty–Eighth, Fortieth, Forty–First, Forty–Fourth and Forty–Eighth Claims. For reasons which follow, the Court rejects those Reports and Recommendations as they relate to Petitioner's Sixteenth Claim. Otherwise, this Court agrees with the Magistrate Judge that the Petitioner is not entitled to relief on any of the other claims.

The Magistrate Judge's Report and Recommendations are thorough, well writ-

ten and have adequately addressed the Petitioner's arguments. Therefore, although this Court has conducted a *de novo* review of those arguments and the record before it, there is no need to "reinvent the wheel" through a written discussion of Petitioner's Objections, Supplemental Objections and Objections to the Supplemental Report and Recommendations as they relate to his Fourth, Seventh, Ninth, Tenth, Twelfth, Thirteenth, Fifteenth, Twentieth, Twenty–Fifth, Twenty–Sixth, Thirty–Sixth, Forty–Fourth and Forty–Eighth Claims. Rather, based upon the reasoning, citations of authority and reference to the record in this matter set forth by Judge Merz in his Report and Recommendations (Doc. # 233) and his Supplemental Report and Recommendations (Doc. # 250), the Court overrules the Petitioner's Objections, Supplemental Objections and Objections to the Supplemental Report and Recommendations, as they relate to those claims. The Magistrate Judge's judicial filings are adopted to that extent.

In addition, with respect to these thirteen claims, the Court cannot find that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Accordingly, the Court overrules the Petitioner's Application for a COA on those claims and adopts the Report and Recommendations of the Magistrate Judge Concerning Certificate of Appealability, as that judicial filing relates to those claims.[1]

The Court now turns to the other claims, addressing them in the order in which they appear on Lawson's Petition and Amended Petition. The Court will discuss related claims together.

---

**1.** The Court notes that the Petitioner did not request a COA on his Thirty–Sixth and Forty–Fourth Claims. *See* Doc. # 246. If he had requested same on those claims, the Court would have denied same.

## I. Second and Third Claims

With these claims, Petitioner contends that his conviction and sentence were obtained in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments, because the attorneys representing him during his trial failed to provide effective assistance of counsel. In particular, with his Second Claim, he contends that he was denied effective assistance of counsel, because his trial counsel decided not to file a motion to suppress tape recordings which the state played to the jury during the guilt phase of his trial. With his Third Claim, he asserts that he was denied effective assistance of counsel, because his trial counsel did not file a motion in limine to prevent the playing of those tape recordings.

After Martin had been murdered, FBI Special Agent Larry Watson convinced Billy and Sue Payton to wear devices to record their conversations with Lawson. Billy Payton had been present when Lawson shot and killed Martin. In the tape of one recorded conversation, Petitioner is heard reminiscing with Billy Payton about the murder:

Petitioner: Number one is this, man, he [Martin] fucked, he fucked you around, your sister [Sue Payton] around, the kids around. A lot of people around him he fucked, my little brother [Timothy Lawson] around, my sister, he tried, tryin' to fuck me around, you (inaudible) ... that shit don't go, not with me you know. *I've killed before man, but everytime I've killed, man you seen how I looked man, I turned fuckin' white, man, fuckin['] start sweating and shit, felt sick.*

Payton: No, you turn into a wild man. (Laughter)

Petitioner: Hey, I can psych myself out now. I can psych myself out, man, that's I've been down that road a few times, like this here. I've been down that road quite a few times (inaudible) whatever....

Trial Transcript at 394–95. Before that tape was played to the jury, Judge Ringland met with counsel for the parties to discuss its admissibility. The Judge suggested that the "I've killed before" statement be excised from the tape before it was played to the jury and indicated that he would prevent the jury from hearing that statement, unless the defense wanted the jury to hear it to support its insanity defense. *Id.* at 318, 320. The prosecution objected to the playing of Payton's comment that the Petitioner turns into a wild man, if his "I've killed before" statement was excised. Judge Ringland agreed and indicated that he would delete all of the above-quoted portion of the tape of that conversation between Petitioner and Billy Payton, which followed the "I've killed before" statement, if that statement were removed, since the remainder was a non sequitur. *Id.* at 323–24. Although Petitioner's counsel initially agreed with the judge, he requested an opportunity to confer with his client before putting the matter to rest. *Id.* at 324. Thereafter, defense counsel announced that, as a matter of strategy, they wanted the entirety of that tape played to the jury. *Id.* at 332–33.

In his Report and Recommendations, the Magistrate Judge recommended that the Court deny relief on the Second and Third Claims. That judicial officer concluded that the doctrine of procedural default barred consideration of the merits of these claims, other than the portion of the tape that contained the "I've killed before" statement, emphasized above. *See* Doc. # 233 at 35–36. With respect to that statement, Judge Merz recommended that the Court deny these claims on the merits. *Id.* at 37–39. The Petitioner has objected to both aspects of the Magistrate Judge's Report and Recommendations relating to

these claims. As a means of analysis, the Court will initially address the recommendation that these claims are barred by the doctrine of procedural default, other than the "I've killed before" statement, following which it will turn to the issue of whether the Petitioner was denied effective assistance of counsel, because trial counsel permitted the jury hear that or any other statement in the tapes.

In *Boyle v. Million*, 201 F.3d 711, 716 (6th Cir.2000), the Sixth Circuit noted that "[w]e have consistently held that, absent cause and prejudice, 'a federal habeas corpus petitioner who fails to comply with a state's rules of procedure waives his right to federal habeas corpus review.' *Gravley v. Mills*, 87 F.3d 779, 784–85 (6th Cir. 1996)." In *Carpenter v. Mohr*, 163 F.3d 938 (6th Cir.1998), *cert. denied*, 528 U.S. 985, 120 S.Ct. 444, 145 L.Ed.2d 362 (1999), the Sixth Circuit wrote:

> Under *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir.1986), the Sixth Circuit utilizes a four part analysis when a state argues that a federal habeas claim has been procedurally defaulted in state court. This court determines: 1) whether there is a procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to follow this rule; 2) whether the state courts actually enforced the state procedural rule; 3) whether the state procedural rule is an adequate and independent state ground to foreclose federal relief; and if so 4) the petitioner must establish cause for his failure to follow the rule and prejudice by the alleged constitutional error. *Id.*

*Id.* at 943 n. 10. *Accord, Reynolds v. Berry*, 146 F.3d 345, 347–48 (6th Cir.1998).

In his direct appeal before the Ohio Supreme Court, the Petitioner argued in his third proposition of law that he had been denied effective assistance of counsel by his trial counsel's "tactical decision" not to object to the admission of a tape recording, upon which Lawson is heard to admit other killings.[2] The Ohio Supreme Court addressed and rejected that claimed error on its merits. *See* 64 Ohio St.3d at 339–42, 595 N.E.2d at 906–07. In his Objections, the Petitioner contends that the Magistrate Judge misinterpreted his request for habeas relief. Doc. # 240 at 9. Therein, he now asserts that his Second and Third Claims were predicated upon the "I've killed before" statement and his comments which followed immediately thereafter, where he indicated that he could psych himself out and that he had been down that road quite a few times. *Id.* This Court agrees with the Petitioner that he is not barred by the doctrine of procedural default from litigating the merits of the entirety of his Second and Third Claims, as he has defined those claims in his Objections. Before the Ohio Supreme Court, the Petitioner argued that he had been denied effective assistance, because his trial counsel had permitted the jury to hear him say that he had committed other murders. This Court is of the opinion that Lawson's statements that he could psych himself out and that he had been down that road quite a few times were merely amplifications on the "I've killed before" statement. Therefore, if Petitioner has exhausted one part of what is essentially a long, run-on sentence, he has exhausted the entirety of that sentence, particularly given that the entirety of that sentence deals with the same topic. Accordingly,

2. With his fourth proposition of law before the Ohio Supreme Court, the Petitioner argued that he had been denied effective assistance of appellate counsel by their failure to raise that issue before the court of appeals.

In his second proposition of law, the Petitioner argued that his statement concerning the prior killings should have been excluded pursuant to Rules 403 and 404(B) of the Ohio Rules of Evidence.

this Court concludes that the Petitioner fairly presented the substance of this aspect of these claims to the Ohio Supreme Court. *See Franklin v. Rose,* 811 F.2d 322, 325 (6th Cir.1987).

Turning to the merits of the Petitioner's Second and Third Claims, the Court begins by setting forth the standards which are applicable to all claims of ineffective assistance of counsel. In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court wrote:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S.Ct. 2052. In *United States v. Fortson,* 194 F.3d 730 (6th Cir. 1999), the Sixth Circuit wrote:

> We "presume from the outset that a lawyer is competent, and therefore, 'the burden rests on the accused to demonstrate a constitutional violation.'" *Pierce,* 62 F.3d at 833 (quoting *United States v. Cronic,* 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)). Moreover, in applying *Strickland,* "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.
>
> The trial process contains a myriad of complex decisions that, for strategic reasons, are sound when made, but may appear unsound with the benefit of hindsight. The defendant, thus, must "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (citation omitted).

*Id.* at 736.

◼ During his direct appeal, the Ohio Supreme Court rejected Petitioner's assertion that he was denied effective assistance of counsel by the failure of his trial counsel to prevent the playing of the tape in question during the guilt phase of his trial. That appellate court concluded that the Petitioner had not met the first prong of a claim under *Strickland,* because the performance of his trial counsel was not deficient, writing:

> Under the circumstances, we conclude that appellant's lawyers did not act incompetently in withdrawing their objection to the "I've killed before" statement. Since appellant stipulated that he shot Martin, the only issue contested at trial was his mental state. Appellant's defense team's trial strategy was to prove appellant's innocence by reason of his insanity. To this end, his attorneys called as a witness Dr. John Peter Lutz, a psychiatrist, who testified that Lawson suffered from "brief reactive psychosis," a temporary form of insanity. Dr. Lutz testified that "[p]sychosis means as a result of a mental or physical illness a person is unable to perceive the circumstances around him in such a way as to guide their internal conception of what is occurring or to make reasonable assessments." Dr. Lutz opined that appellant's statement that "I've killed be-

fore" supported his psychiatric diagnosis because it evidenced appellant's alleged penchant for exaggeration and empty boasting.

Moreover, the "I've killed before" statement also supported Lutz's diagnosis by providing the necessary context for Payton's response: "No, you turn into a wild man." The "wild man" comment bolstered appellant's insanity defense but would be rendered meaningless without the preceding statement. 64 Ohio St.3d at 341, 595 N.E.2d at 907. This Court concludes that the Ohio Supreme Court's holding that Petitioner's trial counsel was not deficient did not constitute an objectively unreasonable application of *Strickland* to the facts of this case. As that appellate court noted, the "I've killed before" statement supported Petitioner's insanity defense. It bears emphasis that this was his only defense, given that he stipulated that he had shot Martin who died as a result. Trial Transcript at 185. In addition, Petitioner's insanity defense was also bolstered, because the jury was, as a consequence, able to hear Payton's comment that the Petitioner acted like a wild man. Judge Ringland had indicated that he would not permit the jury to hear that portion of the tape, if the "I've killed before" statement was excised.

With respect to Petitioner's comments that he could psych himself out and that he had been down that road quite a few times, the Ohio Supreme Court did not expressly address the question of whether trial counsel's failure to prevent the jury from hearing those comments (separate and apart from their failure to prevent it from hearing the "I've killed before" comment) constituted the ineffective assistance of counsel. Assuming *for* present purposes that counsel's performance was deficient in that regard, the Court concludes that said presumed deficiency did not cause the Petitioner to suffer prejudice. The jury heard the "I've killed before" statement. Per-

mitting the jury to hear Petitioner's additional comments, which if analyzed closely, simply amplify and emphasize the other statement, was not such a serious error by counsel as to convince this Court that the Petitioner was deprived of a fair trial, one whose result is reliable. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

Accordingly, the Court sustains in part and overrules in part the Petitioner's Objections to the Initial Report and Recommendations, as they relate to the Second and Third Claims. The Court sustains those Objections to the Initial Report and Recommendations, to the extent that Petitioner challenges the recommendation of the Magistrate Judge that a portion of these claims are barred by the doctrine of procedural default. The Court overrules the Objections to the Initial Report and Recommendations, as they relate to the merits of these claims. The Court also overrules Petitioner's Objections to the Supplemental Report and Recommendations. The Court adopts the Initial and Supplemental Reports and Recommendations, as expanded upon by the reasoning herein, as they relate to the merits of those claims. In his Report and Recommendations Concerning Certificate of Appealability, Judge Merz recommended that this Court grant a COA on these claims, to the extent they are predicated upon the "I've killed before" statement. *See* Doc. # 251 at 3–4. The Magistrate Judge recommended that the Court deny a COA on these claims, to the extent that they focus more broadly on all tapes that were played. *Id.* The Petitioner has objected to the limited nature of the recommendation, and the Respondent has not objected. Based upon its own independent review, as well as upon the reasoning herein, the Court cannot concur with that limited recommendation. Rather, the Petitioner is entitled to a COA on the entirety of these claims, as defined by the Petitioner in his

Objections (Doc. # 240 at 9). Accordingly, the Court grants a COA on the Second and Third Claims. Therefore, the Court sustains Petitioner's Application for a COA and his Objections to the Report and Recommendations Concerning Certificate of Appealability, as they relate to these claims.[3]

## II. Sixteenth Claim

With his Sixteenth Claim, the Petitioner contends that he was denied effective assistance of counsel during the penalty phase of his trial, because his trial counsel failed to request a jury instruction concerning his mental disease or defect as a mitigating factor for the jury to consider. Judge Merz addressed the merits of this claim and concluded that the Petitioner was not entitled to relief, since he had not established the prejudice prong of an ineffective assistance of counsel claim. In reaching that conclusion, the Magistrate Judge adopted the reasoning which had been put forward by the Respondent. The Petitioner has objected, claiming that he has demonstrated that he suffered prejudice. For reasons which follow, this Court agrees with the Petitioner. The Court begins its analysis by examining Ohio's statutory framework for consideration of mitigating factors.

Section 2929.04(B) sets forth mitigating factors a jury can consider. Under § 2929.04(B)(3), a possible mitigating factor is "[w]hether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law." At the conclusion of the penalty phase, Judge Ringland instructed the jury on the mitigating factors they could consider:

> What are mitigating factors? The statute provides certain mitigating factors, some of which may not apply to this hearing. Mitigating factors are factors that, while they do not justify or excuse the crime of aggravated murder, nevertheless may be considered by you as extenuating, lessening, weakening, excusing to some extent, or reducing the degree of defendant's blame. These statutory mitigating factors include, but are not limited to: number one, the history, character and background of the offender. Number two, whether the victim of the offense induced or facilitated it. Number three, whether it was unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion or strong provocation. Number four, any other factors that are relevant to the issue of whether the offender should be sentenced to death.

Trial Transcript at 1511–12. That instruction tracks § 2929.04(B) and some of its subdivisions; however, notably missing is

---

**3.** With his Sixth Claim, the Petitioner argues that he was denied effective assistance of counsel when his trial counsel failed to object to the playing of the tape. In his Report and Recommendations, Judge Merz noted that the Sixth Claim merely repeated Petitioner's Second and Third Claims. *See* Doc. # 233 at 46. In his Objections to the Initial Report and Recommendations, the Petitioner does not dispute that characterization and merely incorporates his arguments relating to the Second and Third Claims. *See* Doc. # 240 at 24. In the absence of an explanation why it is necessary to repeat the grounds for relief set forth in the Second and Third Claims with the Sixth Claim, this Court overrules Petitioner's Objections to the Initial Report and Recommendations and Objections to the Supplemental Report and Recommendations, as they relate to the Sixth Claim. The Court adopts the Initial and Supplemental Reports and Recommendations as they relate to that claim. Given that reasonable jurists could not disagree with this Court's rejection of this claim, the Court denies the Petitioner's request for a COA on that claim.

any reference to § 2929.04(B)(3) and the Petitioner's mental disease or defect. There is no indication in the record that Petitioner's trial counsel requested an instruction based upon § 2929.04(B)(3) or that they objected to Judge Ringland's failure to give such an instruction.

In his Report and Recommendations, the Magistrate Judge found it unnecessary to decide whether Petitioner's trial counsel performed deficiently by neglecting to request a jury instruction based upon § 2929.04(B)(3), since he concluded that the Petitioner had not suffered prejudice. *See* Doc. # 233 at 68. Based upon its independent review of the record, this Court concludes that trial counsel's performance was deficient in that regard. The Petitioner's sole defense during the guilt phase of his trial was insanity. He stipulated that he had fired a handgun and that a bullet from that weapon had struck Martin, who had subsequently died. During the guilt phase, the Petitioner presented extensive testimony from Dr. John Lutz, a mental health professional who opined that he suffered from brief reactive psychosis, a form of temporary insanity. During the penalty phase of the trial, Petitioner presented additional testimony relating to his mental condition from Dr. David Chiappone, a colleague of Dr. Lutz. Given that the Petitioner had defended on the basis of insanity and had presented additional evidence that he suffered a mental disease or defect during the penalty phase of his trial (the testimony by Dr. Chiappone), this Court concludes that the decision not to request a jury instruction addressing § 2929.04(B)(3) was not trial strategy. Given the significant amount of evidence that was introduced about Petitioner's mental health, an issue that formed the crux of his defense, it is inconceivable that a competent trial attorney would, for strategic reasons, decline to request a jury instruction on mental disease or defect as a mitigating factor during the penalty phase of Petitioner's trial. In other words, the Petitioner has "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Fortson,* 194 F.3d at 736 (citation omitted). That conclusion is further buttressed by the testimony from Petitioner's surviving trial counsel, John Woliver, who testified during the evidentiary hearing before Judge Merz that he could not remember why such a jury instruction had not been requested. Transcript of December 2, 1997, Hearing (Doc. # 212) at 399.

As indicated, Judge Merz recommended that this Court deny relief to the Petitioner on this claim, because he had not demonstrated that the absence of a jury instruction based upon § 2929.04(B)(3) caused him to suffer prejudice. In particular, that judicial officer noted that under the law of Ohio, as it existed when the Petitioner was tried, Judge Ringland, the Clermont County Court of Appeals and the Ohio Supreme Court were all obligated to re-weigh the aggravating circumstances and the mitigating factors. *See* Doc. # 233 at 70–71 (citing Ohio Revised Code § 2929.03(D)(3) and (F) and § 2929.05(A)). According to the Magistrate Judge, that re-weighing cured any prejudice the Petitioner suffered as a result of the failure to instruct the jury that one mitigating factor they could consider was "[w]hether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to *conform the offender's conduct to the requirements of the law.*" Ohio Rev.Code § 2929.04(B)(3). Because, in this Court's opinion, Judge Merz did not take into account important aspects of the law of Ohio, this Court cannot agree with his analysis.

During the penalty phase of Petitioner's trial, the state would have the burden of

proving, beyond a reasonable doubt, that, based upon evidence introduced at both the guilt and penalty phases, the aggravating circumstances, found by the jury in the guilt phase, outweighed the mitigating factors. Ohio Rev.Code § 2929.03(D)(2). If the jury did not unanimously find that the state had met its burden of proof in that regard, the death penalty could not be imposed upon the Petitioner. *Id.* If, however, the jury unanimously found that the state had met that burden, it was required to recommend that the sentence be death. *Id.* It bears emphasis that, under § 2929.03(D)(2), the jury had an absolute veto power over the imposition of the death penalty, since it could not be imposed upon the Petitioner, unless that panel had unanimously found that the state has proved beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors. Judge Merz's analysis of this issue did not take into account the fact that the jury has the power to spare the capital defendant's life, a power which no court can override. Anyone familiar with the imposition of the death penalty in Ohio realizes that the jury's power is vital to a capital defendant. This Court could locate no decisions in which the trial court or the intermediate appellate court, after re-weighing the aggravating circumstances and mitigating factors, concluded that the jury erroneously imposed the death penalty. The Ohio Supreme Court has on only two occasions reversed the imposition of the death penalty on the basis that the state had failed to prove beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors. *State v. Claytor,* 61 Ohio St.3d 234, 574 N.E.2d 472 (1991); *State v. Lawrence,* 44 Ohio St.3d 24, 541

N.E.2d 451 (1989).[4] In other words, the jury is, in Ohio, the only realistic possibility by which a defendant, convicted of a capital offense, can avoid a sentence of death.

In his Report and Recommendations, Judge Merz analyzed decisions by the United States Supreme Court and concluded that they supported the proposition that the Ohio courts' independent re-weighing of the aggravating circumstances and mitigating factors cured any prejudice the Petitioner had suffered as a consequence of trial counsel's failure to request a jury instruction on his mental disease or defect in the penalty phase of his trial. This Court cannot agree that the Supreme Court authority is relevant to the question of whether trial counsel's deficient performance caused this Petitioner to suffer prejudice. The Petitioner is not arguing that the failure of Judge Ringland to give a jury instruction on mental disease or defect as a mitigating factor violated his constitutional rights. Rather, the Petitioner contends that his trial counsel failed to provide effective assistance of counsel by not requesting that Judge Ringland give such an instruction. The Petitioner's right to such an instruction flows from Ohio law, § 2929.04(B)(3), which explicitly provides that a defendant's mental disease or defect can be a mitigating factor. There is no indication in the record that Judge Ringland would have refused such an instruction, if Petitioner's trial counsel had requested same.[5] Moreover, the Petitioner suffered prejudice, as that term is defined by *Strickland,* as a result of his trial counsel's failure to request such an instruction. The jury heard evidence during both phases of the trial about the Petitioner's mental

---

4. In each of those decisions, Justice Resnick, joined by Justice Douglas, dissented. Chief Justice Moyer joined the dissenting opinion in *Lawrence.*

5. One might argue that the trial court's failure to instruct the jury on § 2929.04(B)(3) constituted plain, constitutional error. This Court does not resolve that question, since the Petitioner has not presented such a claim.

health. At the conclusion of the guilt phase, the jury was told that it could consider and give effect to that evidence through the Petitioner's insanity defense. At the conclusion of the penalty phase, the jury was given no guidance on how to consider or to give effect to that evidence. That omission is tantamount to failing to instruct a jury on the crucial issue in the case, for instance telling a jury that it can find the defendant guilty of an offense charged in the indictment without explaining the essential elements of that offense. In the absence of an instruction telling the jury how it could and should consider the mental health evidence during the penalty phase, it is quite likely that the jury failed to consider that evidence at all, when it weighed the aggravating circumstances and mitigating factors, since it had already rejected that evidence during the guilt phase. There is a familiar adage that a jury is presumed to follow the instructions of law given by the court. However, there is no maxim that, if there are no instructions on point, the jury will be presumed to have found its way to the correct decision or applied the correct legal standards, on which it had not been instructed, to reach a factually and legally sustainable verdict. By neglecting to instruct the jury that the Petitioner's mental disease or defect is a mitigating factor, the trial court deprived him of the possibility that the jury would, on the basis of that evidence in mitigation, conclude that the state had failed to prove that the aggravating circumstances outweighed the mitigating factors and, thus, spare his life. In essence, the jury was taken out of its role in the penalty phase and out of the calculus of the death sentence equation. The jury's role in the penalty phase became meaningless. It simply was without the tools necessary to discharge its statutory function.

However, even if the Supreme Court authority discussed by the Magistrate Judge were applicable, this Court would conclude that it does not support that judicial officer's recommendation on this claim. Initially, the Magistrate Judge examined *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Therein, the Supreme Court held that the failure of the trial court to instruct the jury that it could consider and give effect to mitigating evidence that Penry was mentally retarded, made the imposition of the death penalty upon him unconstitutional. The *Penry* Court wrote "that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer; [rather,] [t]he sentencer must also be able to consider and give effect to that evidence in imposing sentence." *Id.* at 319, 109 S.Ct. 2934.[6] Judge Merz distinguished *Penry,* noting that Penry had been prosecuted under the laws of Texas which provided that the trial court was required to impose the sentence of death, if the jury returned a verdict of same. Doc. # 233 at 70. Respectfully, this Court considers that to be a distinction without a difference. Under *Penry,* the failure to instruct the jury in such a manner as to enable it to consider and to give effect to the mitigation evidence renders the sentence of death unconstitutional, *regardless* of whether the trial court is or is not required to follow the jury's recommendation. Although an Ohio jury's decision to impose the death penalty is independently reviewed by the state trial and appellate courts, the decision of a jury *not* to impose such a sentence is final. Thus, the failure to provide

---

6. As Judge Merz noted, the circumstances of Penry's trial were similar to Petitioner's. *See* Doc. # 233 at 68. In both cases, an insanity defense was raised and rejected by the jury. In neither trial was the jury instructed on how to consider or to give effect to the mental health evidence concerning the defendant which had been introduced during the penalty phase.

a jury instruction on § 2929.04(B)(3) violated the Supreme Court's holding in *Penry*, because the jury was not instructed during the penalty phase how it should consider and give effect to the evidence it had heard concerning the Petitioner's mental health, i.e., it was not instructed on the question of the significance of the evidence it had heard and, depending upon how much weight or credibility the members should choose to assign to it, on the exact issue at hand, whether it was a mitigating factor sufficient to outweigh the aggravating circumstances and, therefore, to warrant a recommendation of a noncapital sentence. Again, under Ohio law, such a recommendation could not be set aside by any court in favor of the death penalty.

Because the trial court, the court of appeals and the Ohio Supreme Court each independently re-weighed the aggravating circumstances and mitigating factors, the Magistrate concluded that *Lambrix v. Singletary,* 520 U.S. 518, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997) was controlling. That decision, however, is not applicable to this case. Therein, the Supreme Court addressed the question of whether *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), prevented the petitioner, in his habeas action, from taking advantage of the rule announced in *Espinosa v. Florida,* 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), because his conviction had become final before *Espinosa* was decided.[7] Indeed, *Espinosa* supports the proposition that the review of the aggravating circumstances and mitigating factors did not cure the prejudice the Petitioner suffered as a result of absence of a jury

instruction on his mental disease or defect. Therein, Espinosa was sentenced to death by the trial court, after a jury returned a verdict recommending that penalty. The jury had been instructed that it could consider, as an aggravating circumstance, that Espinosa's actions had been especially wicked, evil, atrocious or cruel. That aggravating circumstance was subsequently found unconstitutional by the United States Supreme Court. The Supreme Court rejected Florida's argument that instructing the jury on the unconstitutional aggravating circumstance did not cause Espinosa to suffer prejudice. Under Florida law, the trial court was not bound by the jury's recommendation; rather, it had to weigh the aggravating circumstances and mitigating factors independently before imposing the sentence of death. The trial court had not weighed the invalid aggravating circumstance. In rejecting Florida's argument that, as a result, the petitioner was not prejudiced, the Supreme Court noted that Florida law required that the trial court pay deference and give great weight to the jury's recommendation. 505 U.S. at 1082, 112 S.Ct. 2926. According to the *Espinosa* Court, Florida split the weighing process in two, with the jury initially weighing the aggravating circumstances and mitigating factors and the trial court incorporating the jury's recommendation into its weighing process. In *Espinosa,* the trial jury's consideration of the invalid factor did influence the trial judge's decision, since he was required to give deference and great weight to that recommendation, a recommendation which did include consideration

---

**7.** Judge Merz indicated that *Lambrix* held that any prejudice the petitioner had suffered as a result of the jury being instructed on an unconstitutional aggravating circumstance was cured by the fact that the trial court independently weighed the aggravating circumstances and mitigating factors. In *Lambrix,* the Supreme Court did not address that question. Indeed, in *Espinosa,* the applicability of which the *Lambrix* Court was considering, the Supreme Court reached the opposite conclusion from the proposition for which *Lambrix* has been cited.

of the invalid circumstance. Ohio law has also split the weighing process in two. *Id.* The jury is given absolute veto power over the imposition of the death penalty. Although the trial and appellate courts independently re-weigh the aggravating circumstances and mitigating factors, they do not engage in that process, unless and until the jury has unanimously found that the aggravating circumstances outweigh the mitigating factors. While the trial judge (and the reviewing appellate courts) were not, as in *Espinosa,* required to give deference to a jury recommendation that was based to some indeterminable degree on an invalid factor, the trial and higher courts that did the weighing in this case were able to consider a significant factor that the jury was not told it should and must consider. There are no means of knowing whether the court reached the same result that the jury, had it been properly instructed, would have reached. What *is* known is that the jury never had the necessary guidance to reach an informed decision, a decision which might well have spared Petitioner's life, thus foreclosing the review by the courts which decided the issue against him. Thus, depriving the jury of an instruction based upon § 2929.04(B)(3) removed the jury from the death penalty calculus, in a manner that prejudiced Petitioner's defense and deprived him of a fair trial, a trial whose result can be said to be reliable. Just as a blue-eyed, capital defendant would be prejudiced if the jury were to be told that it could impose the death penalty because he has blue eyes, and the jury were to recommend death, the Petitioner herein was prejudiced by the failure to instruct the jury that his mental disease or defect was a mitigating factor. In short, there is no qualitative difference, in this context, between a blatantly erroneous instruction, on the one hand, and the omission of a critical instruction focused on the central issue in the criminal proceeding, on

the other. In either scenario, the defendant has been deprived of a fair trial.

Based upon the foregoing, the Court rejects the recommendation of the Magistrate Judge that decisions of the United States Supreme Court mandate the conclusion that any prejudice suffered by the Petitioner, as a result of the failure to instruct the jury on the mental health mitigating factor, was cured by the state courts' independent weighing of the aggravating circumstances and mitigating factors. The record convinces that Court that the Petitioner suffered prejudice as a result of his counsel's failure to request an instruction based upon § 2929.04(B)(3). The Petitioner's entire trial strategy was based on a mental illness defense. During jury instructions at the conclusion of the guilt phase, the jury was told that it could consider the evidence of his mental illness, when ruling upon the insanity defense. Although additional evidence of Petitioner's mental illness was introduced during the penalty phase, the jury was not given an instruction on how to consider that evidence, when deciding whether to spare the Petitioner's life. For that matter, the jury was not told that it could constitute a mitigating factor which it must consider when determining whether the aggravating circumstances outweighed the mitigating factors, the critical determination on whether Petitioner would live or die. If the jury had been given such an instruction, it might have returned a verdict, recommending that the Petitioner's life be spared, a recommendation which no court could have set aside in favor of the death penalty. Failing to instruct the jury on that issue had the effect of removing it from the sentencing equation and depriving the Petitioner of his only realistic hope of being sentenced to anything but death. Thus, the Court finds that the Petitioner has demonstrated that "counsel's errors were so serious as to deprive the defen-

dant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

In sum, the Court concludes that Petitioner was deprived of effective assistance of counsel, in violation of the Sixth Amendment, by the failure of his trial counsel to request an instruction based upon § 2929.04(B)(3), during the penalty phase of his trial. In addition, the Court concludes that the decision of the state court that he was not deprived of his right to effective assistance of counsel as a result, made during Petitioner's post-conviction proceeding under § 2953.21, constitutes an unreasonable application of clearly established federal law, *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Accordingly, the Court sustains the Petitioner's Supplemental Objections to Report and Recommendations of the Magistrate Judge (Doc. # 244), and Objections to the Supplemental Report and Recommendations (Doc. # 252), as those filings relate to the Sixteenth Claim. The Court rejects the Report and Recommendations (Doc. # 233) and Supplemental Report and Recommendations (Doc. # 250) as they relate to this claim.

### III. *Twenty–Third and Twenty–Fourth Claims*

With these two claims, the Petitioner contends that the state violated its obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, by withholding favorable evidence from him. Judge Merz recommended that this Court deny these claims on the merits. As a means of analysis, this Court will briefly review the jurisprudence pertaining to *Brady* and its progeny, following which it will turn to the parties' arguments concerning the prosecution's alleged *Brady* violation.

As the Sixth Circuit has noted, *Brady* did not create a general constitutional right to discovery in criminal case; rather, the rule established therein "is concerned only with cases in which the government possesses information which the defendant does not, and the government's failure to disclose the information deprives the defendant of a fair trial." *United States v. Mullins,* 22 F.3d 1365, 1371 (6th Cir.1994). *Brady* imposes upon the government "an obligation 'to turn over evidence in its possession that is both favorable to the accused and *material to guilt* ....' " *United States v. Phillip,* 948 F.2d 241, 249 (6th Cir.1991) (quoting *Pennsylvania v. Ritchie,* 480 U.S. 39, 57, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987)) (emphasis supplied by the Sixth Circuit). In *Schledwitz v. United States,* 169 F.3d 1003 (6th Cir. 1999), the Sixth Circuit elaborated upon the materiality requirement of *Brady:*

> When the defendant, as in this case, asserts that the newly discovered *Brady* evidence is exculpatory, the defendant will be entitled to a new trial if he shows that the favorable evidence at issue was "material." *United States v. Frost,* 125 F.3d 346, 382 (6th Cir.1997). In *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the Supreme Court clarified the "materiality" analysis. The Court explained that a showing of materiality does not require the suppressed evidence in question establish the defendant's innocence by a preponderance of the evidence. Rather, the "question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434, 115 S.Ct. 1555; *Frost,* 125 F.3d at 382–83. Nor does the defendant need to "demonstrate that after discounting the inculpatory evidence

in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, 514 U.S. at 434–35, 115 S.Ct. 1555; *United States v. Smith*, 77 F.3d 511, 515 (D.C.Cir.1996) (materiality requirement is not a sufficiency-of-the-evidence test).

Instead, any favorable evidence, regardless of whether the defendant has made a request for such evidence, is "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433–34, 115 S.Ct. 1555 (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)); *Frost*, 125 F.3d at 382. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375; *United States v. Presser*, 844 F.2d 1275, 1281 (6th Cir.1988). Moreover, in determining whether undisclosed evidence is material, the suppressed evidence is considered collectively, rather than item-by-item, to determine if the "reasonable probability" test is met. *Kyles*, 514 U.S. at 436, 115 S.Ct. 1555; *Frost*, 125 F.3d at 383.

*Id.* at 1011–12. In addition, "*Brady* recognizes no distinction between evidence which serves to impeach a government witness' credibility and evidence which is directly exculpatory of the defendant. Both are 'evidence favorable to the accused' and must be disclosed." *Mullins*, 22 F.3d at 1372. *See also Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [*Brady*]"). The Sixth Circuit has said that "[n]o *Brady* violation exists where a defendant 'knew or should have known the essential facts permitting him to take advan-

tage of any exculpatory information.'" *United States v. Clark*, 928 F.2d 733, 738 (6th Cir.), *cert. denied*, 502 U.S. 846, 112 S.Ct. 144, 116 L.Ed.2d 110 (1991) (quoting *United States v. Grossman*, 843 F.2d 78, 85 (2nd Cir.1988), *cert. denied*, 488 U.S. 1040, 109 S.Ct. 864, 102 L.Ed.2d 988 (1989)). *See also, Mullins*, 22 F.3d at 1371–72 ("*Brady* is concerned only with cases in which the government possesses information which the defendant does not, and the government's failure to disclose the information deprives the defendant of a fair trial"); *United States v. Todd*, 920 F.2d 399, 405 (6th Cir.1990). Moreover, the Sixth Circuit has indicated that there is no violation of *Brady*, unless the undisclosed materials would have led directly to the discovery of admissible evidence. *Phillip*, 948 F.2d at 249–50.

 The Petitioner argues that the prosecution violated *Brady* and its progeny, by failing to disclose exculpatory information. In particular, the Petitioner argues that the prosecution should have disclosed notes from an interview with Billy Payton, in which he indicated that Tim Lawson had given the gun to the Petitioner before the latter used that weapon to kill Martin (Exhibit 2 to the Hearing conducted by Judge Merz); an October 2, 1987, memorandum, indicating that Tim Lawson, Petitioner's brother, had threatened Martin (Exhibit 4 to the Hearing conducted by Judge Merz); an October 8, 1997, memorandum, indicating that Tim Lawson had threatened Martin (Exhibit 5 to the Hearing conducted by Judge Merz); a memorandum by FBI Agent Watson, stating that he had been informed by a confidential source that Tim Lawson and Martin had stolen weapons from Greg Hall (Exhibit 7 to the Hearing conducted by Judge Merz); another memo from Watson in which he indicated that Billy Payton had stated that both Lawson brothers tortured Martin after the Petitioner had shot him and that

the Petitioner had shot him three or four times (Exhibit 8 to the Hearing conducted by Judge Merz); and an investigator's notes, indicating that both Lawson brothers kicked Martin after Petitioner had shot him (Exhibit 8 to the Hearing conducted by Judge Merz).[8] The Magistrate Judge recommended that the Court deny these claims on their merits, because the Petitioner had failed to demonstrate that the prosecution withheld any information which was material. For reasons which follow, this Court agrees with the Magistrate Judge that the Petitioner is not entitled to relief on these claims.[9]

The Petitioner claims that the information in question is material, because it would have cast doubt on Tim Lawson's testimony. Assuming for sake of argument that the material would have cast doubt on that testimony, that would not have resulted in the Petitioner being less culpable, i.e., less legally responsible for Martin's death. The Exhibits in question indicate that Tim Lawson gave his brother a handgun which the Petitioner used to shoot Martin, and that after that had occurred, both Lawson brothers tortured or kicked him. While that information might have caused the jury to believe that Tim Lawson was a bit more involved in the homicide of Martin than his testimony would indicate, it would not have reduced the Petitioner's culpability, particularly in light of the stipulation that he had fired a weap-

on which had caused the death of Martin. Thus, the Court concludes that in its absence of that information, the Petitioner nonetheless received a fair trial, "a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

Accordingly, the Court overrules the Petitioner's Objections to the Initial Report and Recommendations and Objections to the Supplemental Report and Recommendations, as they relate to the Twenty–Third and Twenty–Fourth Claims. The Court adopts the Initial and Supplemental Reports and Recommendations, as expanded upon by the reasoning herein, as they relate to the Twenty–Third and Twenty–Fourth Claims. However, unlike the Magistrate Judge, the Court concludes that reasonable jurists could find the resolution of these claims debatable. Consequently, Petitioner is entitled to a COA on the Twenty–Third and Twenty–Fourth Claims. Therefore, the Court sustains Petitioner's Application for a COA and his Objections to the Report and Recommendations Concerning Certificate of Appealability, while rejecting that judicial filing, as they relate these claims.

The Petitioner devotes a significant portion of his Objections to the Initial Report and Recommendations on these claims to arguing that he is entitled to a new trial, because state agents listened to his con-

---

8. The Petitioner also claimed that the prosecution violated *Brady*, by failing to disclose the address of Billy Payton. For the reasons set forth by the Magistrate Judge in his Report and Recommendations (Doc. # 233), this Court does not agree. As the Magistrate Judge noted, the prosecution agreed, during a pretrial proceeding, to make Billy Payton available to Petitioner's counsel; however, counsel never followed up on that offer. *See* Doc. # 233 at 83. Therefore, the Court concludes that the asserted failure to disclose the address of Billy Payton did not violate *Brady*.

9. During his direct appeal, the Petitioner presented his *Brady* claim to the Ohio Supreme Court, which rejected it, without having directed that an evidentiary hearing occur. In particular, that court noted that some of the materials which the prosecution had failed to produce were in the possession of Watson, an FBI agent; therefore, his documents were not in the possession of the prosecution. 64 Ohio St.3d at 344, 595 N.E.2d at 909. Judge Merz found that the prosecution was aware of the contents of Watson's notes. *See* Doc. # 233 at 87. This Court concurs with the reasoning of Judge Merz in that regard.

versations with his counsel. Therein, the Petitioner expressly requests that the Court grant him leave to file an amended or successive petition to raise that issue. *See* Doc. # 240 at 47. In response, the Magistrate Judge recommended in the Supplemental Report and Recommendations that the Court deny the Petitioner's request that he be permitted to file an amended petition. Doc. # 250 at 8–10. That judicial officer concluded that the Petitioner's request was untimely under the statute of limitations adopted for habeas proceedings as part of the AEDPA, 28 U.S.C. § 2244(d)(1). The Petitioner, in turn, has filed a Supplemental Application for Certificate of Appealability (Doc. # 253), requesting a COA on the issue of whether he should be permitted to amend his petition.

■ The decision of whether to grant a motion for leave to amend a habeas corpus petition is governed by Rule 15 of the Federal Rules of Civil Procedure. See 28 U.S.C. § 2242 ¶ 3 (explaining that an application for a writ of habeas corpus "may be amended or supplemented as provided in the rules of procedure applicable to civil actions"); *Hodges v. Rose*, 570 F.2d 643, 649 (6th Cir.1978) ("Amendment of a petition for habeas corpus is governed by 'the rules of procedure applicable to civil actions.' ") (quoting 28 U.S.C. § 2242). In *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), the Supreme Court indicated that a District Court should deny leave to amend, only in instances where the amendment would be futile, the moving party has acted in bad faith or has repeatedly failed to cure the deficiencies by previous amendments, the opposing party would be subjected to unfair prejudice or the moving party has unduly delayed. *See also, Brooks v. Celeste*, 39 F.3d 125, 130 (6th Cir.1994). In his

Supplemental Application, the Petitioner cited *Piner v. United States*, 1999 WL 454708, 182 F.3d 918 (6th Cir.1999), wherein the Sixth Circuit applied those familiar standards and concluded that the petitioner should be permitted to amend his petition, which had been filed after the AEDPA had become effective. Therein, the Sixth Circuit did not discuss the question of whether the amended petition would be barred by § 2244(d)(1)'s statute of limitations.

■ For reasons different than the Magistrate Judge, this Court concludes that it would be futile to permit the Petitioner to amend his petition to assert a claim based upon the fact that his conversations with his trial counsel were overheard by agents of the state. There is no indication, anywhere in the record, that the Petitioner raised that issue either on his direct appeal or during his post-conviction proceedings in state court. Under the AEDPA, available state remedies must be exhausted before a person can obtain a writ of habeas corpus. 28 U.S.C. § 2254(b)(1). Given that reasonable jurists could not disagree with this Court's conclusion that the Petitioner's failure to exhaust his available state remedies renders an attempt to amend his habeas petition futile, the Court overrules his Supplemental Application for Certificate of Appealability (Doc. # 253).

*IV. Twenty–Seventh Claim*

■ With this claim, the Petitioner alleges that the prosecutor engaged in misconduct. In particular, he contends that he was denied due process of law during the penalty phase of his trial, when the prosecuting attorney commented on what he (Lawson) deems are non-statutory aggravating circumstances, in violation of the Fourteenth Amendment.[10] This claim

---

**10.** Petitioner also cites the Fifth, Sixth and

Eighth Amendments. However, a claim of

arises out of the testimony of the Petitioner's mother, as a defense witness, during the penalty phase of his trial. In the rebuttal phase of his closing argument, the prosecutor commented on that testimony:

> Now, we heard from the defendant's mother. And, you know, this is very uncomfortable for me to speak about because I think you, just like I have, have watched the vigil that woman has kept for well going on to 40 days now. She quietly sat back there and supported this man. And I can't help and I haven't been able to help for 40 days to think about my own mother and when my father died and I watched her suffer and more so than me grieving over the death of my father. I watched my mother suffer and that hurt. And when she took that stand[,] I hurt for Mrs. Lawson, and you can't deny that there is anyone that wasn't affected, and I saw a number of you cry[,] and[,] because I'm out here and I'm an attorney and this is my business[,] I fought back the tears[,] and I swallowed hard[,] and there was only one person in this courtroom who didn't[,] and it's that man right there. And if anybody took the time to look over at him like I did and saw the reaction that he had to his own mother on that stand, it was chilling. *And I want you to carry that with you when you weigh the aggravating circumstances versus the mitigating factors—*

Trial Transcript at 1498 (emphasis added). Petitioner's counsel immediately asked to approach the bench, at which point he requested a mistrial focusing on the prosecutor's comments about how the Petitioner had reacted to his mother's testimony. *Id.* at 1499. That request was denied; however, the trial court instructed the jury that the statements of counsel are not evidence,

but merely constitute argument. *Id.* at 1499–1500.

In *Simpson v. Jones,* 238 F.3d 399, 409 (6th Cir.2000), the Sixth Circuit restated what a state prisoner must show in order to demonstrate that prosecutorial misconduct deprived him of due process in violation of the Fourteenth Amendment and that, therefore, he is entitled to a writ of habeas corpus:

> In order to prevail on a claim of prosecutorial misconduct, a habeas petitioner must demonstrate that the statements of the prosecutor "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). In order to deny due process, the misconduct must be " 'so pronounced and persistent that it permeates the entire atmosphere of the trial' or 'so gross as probably to prejudice the defendant.' " *Pritchett v. Pitcher,* 117 F.3d 959, 964 (6th Cir.1997).

*Id.* at 409. *See also, Serra v. Michigan Dept. of Corrections,* 4 F.3d 1348, 1354 (6th Cir.1993) (indicating that, when prosecutorial misconduct "rises to the level of depriving the defendant of fundamental fairness in the trial process, the claim is remediable on a petition for habeas corpus relief"), *cert. denied,* 510 U.S. 1201, 114 S.Ct. 1317, 127 L.Ed.2d 666 (1994). In *Boyle v. Million,* 201 F.3d 711 (6th Cir. 2000), the Sixth Circuit discussed the factors a court should consider when deciding whether to grant a writ of habeas corpus on the basis of prosecutorial misconduct:

> In *United States v. Carroll,* 26 F.3d 1380 (6th Cir.1994), we summarized our recent jurisprudence on the issue of prosecutorial misconduct in an effort to

---

prosecutorial misconduct is to be determined in accordance with the Due Process Clause of the Fourteenth Amendment. *Simpson v.*

*Jones,* 238 F.3d 399, 409 (6th Cir.2000). Therefore, this Court need not consider the Fifth, Sixth and Eighth Amendments further.

provide guidance for future cases and noted that, when addressing claims of prosecutorial misconduct, we first determine whether the challenged statements were indeed improper. *See United States v. Francis,* 170 F.3d 546, 549 (6th Cir.1999). Upon a finding of such impropriety, we then "look to see if they were flagrant and warrant reversal." *Id.* (citing *Carroll,* 26 F.3d at 1388). Flagrancy is determined by an examination of four factors: "1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused." *Id.* at 549–50.

*Id.* at 717. *Accord, Serra,* 4 F.3d at 1355–56.

 As indicated, the Petitioner claims that the prosecutor deprived him of due process and committed misconduct. In particular, the Petitioner focuses upon the final sentence from the quoted portion of the rebuttal argument, that which has been emphasized, and argues that the prosecutor added a non-statutory aggravating circumstance thereby, to wit: the failure to display emotion when your mother gives moving testimony. This Court cannot agree. The prosecutor did not tell the jury that such lack of emotion is a aggravating circumstance; rather, he told the jury that they should remember that lack of emotion when they weighed the aggravating circumstances versus the mitigating factors. Judge Ringland instructed the jury that they could consider the Petitioner's character as a mitigating factor. Whether the Petitioner displayed emotion at his mother's moving testimony could be considered by the jury as evidence of his character. Moreover, the Court cannot conclude that it is possible that the jury was left with the incorrect impression that the Petitioner's lack of emotion was an aggravating circumstance. Shortly after the prosecutor had completed his rebuttal argument, the trial court gave its instructions to the jury. During those instructions, the trial court repeatedly told the jury that the aggravating circumstances which they were to consider were those for which they had previously found the Petitioner guilty. *See* Trial Transcript at 1503–04, 1504, 1505, 1506, 1509 and 1510–11. Those instructions, coupled with the fact that the trial court told the jury that the prosecutor's allegedly improper comments were merely argument, immediately after those comments had been made, convince this Court that the jury could not have misunderstood those comments as introducing a new aggravating circumstance into their deliberations. Therefore, the Petitioner's premise that he suffered a deprivation of due process, as a result of the above referenced portion of the prosecutor's rebuttal argument, is without merit.

Accordingly, the Court overrules the Petitioner's Objections to the Initial Report and Recommendations and Objections to the Supplemental Report and Recommendations, as they relate to the Twenty–Seventh Claim. Given that reasonable jurists could not disagree with this Court's conclusion that the prosecutor's rebuttal argument did not cause him to suffer a deprivation of due process, the Court denies the Petitioner a COA on this claim; therefore, it overrules Petitioner's Application for a COA and his Objections to the Report and Recommendations Concerning Certificate of Appealability, while adopting that judicial filing, as they relate to this claim.

## V. *Twenty–Ninth and Thirtieth Claims*

With these claims, the Petitioner claims that his conviction for aggravated murder and aggravated murder as a principal of-

fender violates the Fifth, Sixth, Eighth and Fourteenth Amendments, because it is not supported by sufficient evidence. Judge Merz recommended that this Court deny relief on these grounds, on the basis of procedural default. This Court agrees with Judge Merz's analysis and writes on these claims in order to address and to reject the Petitioner's argument that his procedural default does prevent this Court from reaching their merits.

The Petitioner challenged the sufficiency of the evidence in his direct appeal to the Clermont County Court of Appeals; however, he failed to include that issue in his appeal before the Ohio Supreme Court. The Sixth Circuit has held that the failure to raise an issue before the Ohio Supreme Court constitutes a procedural default. *Norris v. Schotten,* 146 F.3d 314, 332 (6th Cir.), *cert. denied,* 525 U.S. 935, 119 S.Ct. 348, 142 L.Ed.2d 287 (1998). *See also, O'Sullivan v. Boerckel,* 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). Moreover, the Clermont County Common Pleas Court refused to address the Petitioner's challenges to the sufficiency of the evidence, during the post-conviction proceedings, concluding that they were barred by the doctrine of *res judicata. See Mapes v. Coyle,* 171 F.3d 408 (6th Cir.) (concluding that the ·petitioner had procedurally defaulted a claim, by not raising it on direct appeal, when the post-conviction court refused to address the merits of the issue on the basis of *res judicata* ), *cert. denied,* 528 U.S. 946, 120 S.Ct. 369, 145 L.Ed.2d 284 (1999).

██ Lawson does not disagree with the foregoing; rather, he argues that he presented this claim to the Ohio Supreme Court, because that judicial body was obligated by § 2929.05(A) of the Ohio Revised Code to conduct its own review of the evidence. That statute provides in pertinent part that the Supreme Court "shall review and independently weigh all of the facts and other evidence disclosed in the record in the case and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in · the case, and whether the sentence of death is appropriate." Based upon that statutory provision, the Petitioner argues that the doctrine of procedural default does not bar a federal court from addressing the merits of a sufficiency of the evidence challenge, regardless of whether the issue was raised in his direct appeal. This Court does not agree. Section 2929.05(A) requires the Supreme Court to review the evidence in order to ascertain whether the aggravating circumstances outweigh the mitigating factors and whether the sentence of death is appropriate. The Ohio Supreme Court noted that the Petitioner had been convicted of three aggravating circumstances, to wit: murder during a kidnaping, Ohio Revised Code § 2929.04(A)(7); murder for the purpose of escaping accountability for another offense, § 2929.04(A)(3); and murder of a witness, § 2929.04(A)(8). 64 Ohio St.3d at 351, 595 N.E.2d at 913. With these claims, the Petitioner does not challenge the sufficiency of the evidence to establish one or more or all of those aggravating circumstances. Rather, with his Twenty–Ninth Claim, Lawson argues that there is not sufficient evidence to establish that he committed the offense of aggravated murder and, with the Thirtieth Claim, that there is not sufficient evidence to establish that he acted as a principal offender. It bears emphasis that the Petitioner did *not* challenge the sufficiency of the evidence to support his conviction for aggravated murder, or that he had acted as a principal offender, in his appeal to the Ohio Supreme Court. Under Ohio law, the Ohio Supreme Court was not required to review the sufficiency of the evidence concerning those questions in .order to decide whether the aggravating circumstances outweigh

the mitigating factors and whether the sentence of death is appropriate. Whether the Petitioner was guilty of aggravated murder or acted as a principal offender is neither an aggravating circumstance nor a mitigating factor. Therefore, the fact that the Ohio Supreme Court re-weighed the aggravating circumstances and mitigating factors does not mean that it determined the sufficiency of the evidence to establish the matters he challenges with these claims.

Moreover, the Court does not agree with Petitioner that *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), supports his position. Therein, the Supreme Court primarily addressed the issue of whether the Constitution requires that an indigent defendant charged with a capital offense be provided a psychiatric examination and assistance to prepare a defense. However, before reaching the merits of that issue, the Supreme Court had to consider whether Ake's failure to raise the issue in his motion for new trial, filed in Oklahoma state court, deprived it of jurisdiction, since the decision below rested on adequate and independent state grounds. *Id.* at 74, 105 S.Ct. 1087. The Supreme Court concluded that the failure did not, because the Oklahoma waiver rule did not apply to fundamental trial errors, which, under state law, included federal constitutional errors. *Id.* at 74–75, 105 S.Ct. 1087. The Supreme Court held that

the state waiver rule was not an independent state ground, since "resolution of the state procedural law question depends on a federal constitutional ruling." *Id.* at 75, 105 S.Ct. 1087. Herein, the Petitioner does not contend that this Court must resolve a federal constitutional issue in order to decide whether the Twenty–Ninth and Thirtieth Claims have been procedurally defaulted. On the contrary, he bases his challenge to the procedural default rule solely upon a state statute, § 2929.05(A).

Accordingly, the Court concludes that it is barred by the doctrine of procedural default from reaching the merits of the Twenty–Ninth and Thirtieth Claims. Consequently, it overrules the Petitioner's Objections to the Initial Report and Recommendations and Objections to the Supplemental Report and Recommendations, as they relate to those claims. The Court adopts the Initial and Supplemental Reports and Recommendations, as expanded upon by the reasoning herein, as they relate to the Twenty–Ninth and Thirtieth Claims. Given that reasonable jurists could not disagree with this Court's conclusion that Petitioner has procedurally defaulted those claims, the Court denies him a COA on these claims; therefore, it overrules Petitioner's Application for a COA and his Objections to the Report and Recommendations Concerning Certificate of Appealability, while adopting that judicial filing, as they relate to same.[11]

---

**11.** Petitioner's Thirty–Fifth Claim is also another challenge to the sufficiency of the evidence by which he was convicted. Judge Merz noted that this claim was duplicative of Petitioner's Twenty–Ninth Claim. *See* Doc. # 233 at 102–03. In his Objections, the Petitioner concedes that his Thirty–Fifth Claim duplicates his Twenty–Ninth such. *See* Doc. # 240 at 82. Accordingly, for the reasons it overruled Petitioner's Objections to the Twenty–Ninth Claim, the Court overrules the Petitioner's Objections to the Initial Report and Recommendations and Objections to the Supplemental Report and Recommendations, as

they relate to the Thirty–Fifth Claim. The Court adopts the Initial and Supplemental Reports and Recommendations, as they apply to that claim. Given that reasonable jurists could not disagree with this Court's conclusion in this regard, the Court denies the Petitioner a COA on the Thirty–Fifth Claim; therefore, it overrules Petitioner's Application for a COA and his Objections to the Report and Recommendations Concerning Certificate of Appealability, while adopting that judicial filing, as they relate to same.

With his Thirty–Seventh Claim, the Petitioner argues that his death sentence is unreliable

## VI. Thirty–Eighth Claim

With this claim, which contains thirteen sub-parts, Lawson challenged the constitutionality of Ohio's capital punishment statute. In the Report and Recommendations, Judge Merz recommended that the Court deny relief on all sub-parts of this claim, concluding that some lacked merit while others were barred by procedural default. See Doc. # 233 at 105–09. In his Objections to the Initial Report and Recommendations, the Petitioner challenges the Magistrate Judge's recommendations with respect to only one of the thirteen sub-parts, the third.[12]

With the third sub-part of the Thirty–Eighth Claim, the Petitioner argues that Ohio's death penalty statute is unconstitutional, because it fails to establish a standard for determining the existence of mitigating factors. The Court rejects that argument, given that the Sixth Circuit recently rejected a similar challenge to Ohio's death penalty statute in Buell v. Mitchell, 274 F.3d 337, 368 (6th Cir.2001).

Accordingly, the Court overrules the Petitioner's Objections to the Initial Report and Recommendations and Objections to the Supplemental Report and Recommendations, as they relate to the third sub-part of the Thirty–Eighth Claim. The Court adopts the Initial and Supplemental Reports and Recommendations, as expanded upon by the reasoning herein, as they relate to that sub-part. Given that reasonable jurists could not disagree with this Court's rejection of Petitioner's assertion that Ohio's death penalty statute is unconstitutional because it fails to establish a standard for determining the existence of mitigating factors, the Court denies the Petitioner a COA on the third sub-part of the Thirty–Eighth Claim; therefore, it overrules Petitioner's Application for a COA and his Objections to the Report and Recommendations Concerning Certificate

and inappropriate, because he was denied the procedural safeguard of a meaningful, independent review of the jury's recommendations of death by the trial court, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. In his Report and Recommendations, Judge Merz interpreted this claim as a challenge to the sufficiency of the evidence and rejected same as duplicative of the Thirty–Fifth Claim, which duplicated the Twenty–Ninth Claim. See Doc. # 233 at 104–05. In his Objections to the Initial Report and Recommendations, the Petitioner accepts the interpretation of the Magistrate Judge and argues that he is entitled to relief on this claim for the same reasons he is entitled to relief on his Thirty–Fifth Claim. See Doc. # 240 at 86. For the reasons it rejected the Petitioner's challenge to the recommended disposition of the Thirty–Fifth Claim, the Court overrules the Petitioner's Objections to the Initial Report and Recommendations and Objections to the Supplemental Report and Recommendations, as they relate to the Thirty–Seventh Claim. The Court adopts the Initial and Supplemental Reports and Recommendations, as they apply to this claim. Given that reasonable jurists could not disagree with this Court's conclusion in that regard, the Court denies the Petitioner a COA on this claim; therefore, it overrules Petitioner's Application for a COA and his Objections to the Report and Recommendations Concerning Certificate of Appealability, while adopting that judicial filing, as they relate to that claim.

12. Based upon its independent review of the Petitioner's arguments and the record, the Court concurs with Judge Merz's recommendation that the Petitioner be denied relief on the first, second and fourth through thirteenth sub-parts of the Thirty–Eighth Claim. Accordingly, the Court adopts the Report and Recommendations (Doc. # 233), as that judicial filing relates to those sub-parts of Petitioner's Thirty–Eighth Claim. Given that reasonable jurists could not disagree with the Magistrate Judge's recommended resolution of those sub-parts, which this Court has adopted herein, the Court denies the Petitioner a COA on those sub-parts; therefore, it overrules Petitioner's Application for a COA and his Objections to the Report and Recommendations Concerning Certificate of Appealability, while adopting that judicial filing, as they relate to those sub-parts.

of Appealability, while adopting that judicial filing, as they relate to same.

## VII. Fortieth Claim

With this claim, the Petitioner asserts that the proportionality reviews which were conducted by the Clermont County Court of Appeals and the Ohio Supreme Court deprived him of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments, because they were limited to cases in which the death penalty has been imposed. Under Ohio Revised Code § 2929.05(A), Ohio's appellate courts must determine "whether the sentence of death is appropriate" and "whether the sentence is excessive or disproportionate to the penalty imposed in similar cases." In *Buell*, *supra*, the Sixth Circuit recently rejected the same argument, holding that a proportionality review is not constitutionally required and that, therefore, Ohio may constitutionally limit its review to cases in which the death penalty has been imposed. 274 F.3d at 368.

■■■ In addition, Petitioner challenges the proportionality review conducted by the Ohio Supreme Court, arguing that it was cursory. That court indicated that it had conducted such a review. 64 Ohio St.3d at 353, 595 N.E.2d at 915. In *Scott v. Anderson*, 58 F.Supp.2d 767, 797–98 (N.D.Ohio 1998), *reversed in part on other grounds*, 209 F.3d 854 (6th Cir.), *cert. denied*, 531 U.S. 1021, 121 S.Ct. 588, 148 L.Ed.2d 503 (2000), the District Court rejected the argument that the appellate courts had conducted a too cursory proportionality review, writing "when a state appellate court expressly states that it has conducted a proportionality review, this Court may not assume that the review was inadequate (or did not really occur) merely because the state court did not describe in writing all aspects of its review." This Court agrees with that reasoning. Moreover, the Petitioner has not pointed to any decision by the United States Supreme Court indicating what type of proportionality review must be conducted by a state court, lest a federal court determine such was too cursory. Consequently, the type of review conducted by the Ohio Supreme Court was not contrary to, nor did it involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States (28 U.S.C. § 2254(d)(1)).

Accordingly, the Court overrules the Petitioner's Objections to the Initial Report and Recommendations and Objections to the Supplemental Report and Recommendations, as they relate to the Fortieth Claim. The Court adopts the Initial and Supplemental Reports and Recommendations, as expanded upon by the reasoning herein, as they relate to that claim. Given that reasonable jurists could not disagree with this Court's conclusion that the proportionality review conducted during Petitioner's direct appeal did not violate his constitutional rights, the Court denies the Petitioner a COA on this claim; therefore, it overrules Petitioner's Application for a COA and his Objections to the Report and Recommendations Concerning Certificate of Appealability, while adopting that judicial filing, as they relate to this claim.

## VIII. Forty–First Claim

With this claim, Petitioner also challenges the proportionality review conducted by Ohio's appellate courts, including the Ohio Supreme Court. To pass constitutional muster, Lawson argues that such a review must involve a cross section of similar cases around the state of Ohio, including cases from counties smaller than Clermont County. Judge Merz recommended that this Court deny this claim on the merits. *See* Doc. # 233 at 111. Based upon the logic of *Buell, supra*, this Court agrees. As indicated, therein, the Sixth

Circuit concluded that Ohio's death penalty statutes did not violate the constitution, as a result of limiting proportionality review, writing "Buell's contentions regarding inadequate appellate review of the proportionality of death sentences under the Ohio statute fail because no proportionality review is constitutionally required. *See Pulley v. Harris,* 465 U.S. 37, 44–51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984)." 274 F.3d at 368. Although the Sixth Circuit did not reject the precise challenge to proportionality which underlies Petitioner's Forty–First Claim, the above-quoted statement from that decision convinces this Court that the asserted inadequacy does not render Ohio's death penalty statutes unconstitutional.

Accordingly, the Court overrules the Petitioner's Objections to the Initial Report and Recommendations and Objections to the Supplemental Report and Recommendations, as they relate to the Forty–First Claim.[13] The Court adopts the Initial and Supplemental Reports and Recommendations, as expanded upon by the reasoning herein, as they relate to that claim. Given that reasonable jurists could not disagree with this Court's rejection of this claim,

the Court denies the Petitioner a COA on this claim; therefore, it overrules Petitioner's Application for a COA and his Objections to the Report and Recommendations Concerning Certificate of Appealability, while adopting that judicial filing, as they relate to this claim.

In sum, the Court concludes that, based upon his Sixteenth Claim, the Petitioner is entitled to a writ of habeas corpus, vacating the sentence of death imposed upon him.[14]

The Court directs that judgment be entered in favor of the Petitioner and against the Respondent on the Sixteenth Claim, and in favor of the Respondent and against the Petitioner on all other claims.

It is anticipated that Petitioner will seek leave to appeal *in forma pauperis.* Such a motion will be granted. The Petitioner is granted a Certificate of Appealability on his Second, Third, Twenty–Third and Twenty–Fourth Claims.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the South-

---

**13.** The Petitioner bases those Objections upon a dissenting opinion by Justice Paul Pfeifer of the Ohio Supreme Court. *See State v. Murphy,* 91 Ohio St.3d 516, 561–64, 747 N.E.2d 765, 812–14 (2001). Therein, Justice Pfeifer criticized the manner in which proportionality review is conducted in Ohio. Without commenting upon that jurist's view of state law, this Court must determine whether the sentence of death was imposed upon the Petitioner as a result of a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

**14.** This Court has vacated the sentence of death imposed upon the Petitioner, rather than issuing a writ conditioned upon Ohio providing him a new trial on the penalty phase of his prosecution, because that sen-

tence was ordered after a penalty phase, which had been rendered fundamentally unfair by ineffective assistance of counsel. Under the law of Ohio, as it existed when the Petitioner committed the crimes for which he was sentenced to death, there was "no statutory authority allowing the imposition of the death penalty upon resentencing." *State v. Penix,* 32 Ohio St.3d 369, 373, 513 N.E.2d 744, 748 (1987). *See also, State v. Bays,* 87 Ohio St.3d 15, 716 N.E.2d 1126 (1999). In *Penix,* the Ohio Supreme Court refused to create a procedure that would permit a second penalty phase to be held, following the vacation of the death sentence imposed upon a defendant, as a result of an error which had occurred during the initial penalty phase of his trial. 32 Ohio St.3d at 373, 513 N.E.2d at 748. Of course, the matter of resentencing is for the courts of Ohio to address.

ern District of Ohio, Western Division, at Dayton.